USDC- BALTIMORE
'26 NOV 13 PM2:06
KK.

# †UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

THERESA CONCEPCION,

Plaintiff.

Case No: GLR-26-4726

v.

RYAN REYNOLDS, an individual; MAXIMUM EFFORT PRODUCTIONS, INC., a New York Domestic Business Corporation; BLAKE LIVELY, an individual; LESLIE SLOANE, an Individual; VISION PR, a New York Domestic Business Corporation; NICK SHAPIRO, an individual; 10th AVENUE CONSULTING, LLC, a California Limited Liability Company, KELLY BUSH NOVAK, an individual; ID PUBLIC RELATIONS, INC. a California Incorporated Entity.

Defendants.

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff Theresa Concepcion ("Plaintiff" or "Ms. Concepcion") brings this action for damages against RYAN REYNOLDS, an individual; MAXIMUM EFFORT PRODUCTIONS, INC., a New York Domestic Business Corporation; BLAKE LIVELY, an individual; LESLIE SLOANE, an individual; VISION PR, a New York Domestic Business Corporation; NICK

SHAPIRO, an individual; 10th AVENUE CONSULTING, LLC, a California Limited Liability Company; KELLY BUSH NOVAK, an individual; ID PUBLIC RELATIONS, INC. a California Incorporated Entity, and alleges as follows:

## JURISDICTION

1. Pursuant to 28 U.S.C. § 1332, this Court has original jurisdiction over the claims for relief asserted in this complaint because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no Defendant is a citizen of the same state as Plaintiff.

## VENUE

2. Venue is proper pursuant to 28 U.S.C § 1391 because Plaintiff is a resident of Maryland and the events giving rise to this complaint occurred while Plaintiff was residing in Baltimore County, Maryland.

## INTRODUCTION

3. "When I want your opinion, I'll take Wolverine's dick out of your mouth!"

4. A 7-year-old girl named Inez was forced to scream this sexually graphic sentence hundreds of times after her father, Ryan Reynolds ("Reynolds") (then 47), threatened to fire her from the role of Kidpool in the movie *Deadpool and Wolverine*.

5. While recording a commentary track alongside the film's director, Shawn Levy (then 56), Reynolds recounted with an almost sadistic glee that, initially, his daughter did not want to speak the line that forced her to imagine her father performing oral sex on Hugh Jackman. According to Reynolds, the little girl only changed her mind when he started looking at other options. Both men laughed as they admitted to forcing the then 7-year-old to say the line 70 to 500 times.

6. Plaintiff is an Afro-Puerto Rican attorney, originally from New Jersey, who graduated from Cornell Law School in 2007 and retired from commercial litigation in 2023 for health reasons.[1] In late 2025, she began making content on social media and in January 2026, discovered the Blake Lively ("Lively") and Justin Baldoni ("Baldoni") dispute surrounding the movie *It Ends With Us*. In discussing the issue of "retaliation," Plaintiff explained why the Nicepool character justified Baldoni calling his PR / crisis management team in August 2024 to combat bullying by Reynolds and Lively. Plaintiff also made a video explaining her concerns with the Kidpool scene[2] and encouraging Reynolds and his wife, Lively, to get therapy for their daughter because of the trauma that was likely caused by the ordeal.

7. In or about May 2026, Reynolds and Lively instructed Nick Shapiro (compensated through 10th Avenue Consulting), Leslie Sloane (compensated through Vision PR until August 2026), and Kelly Bush Novak, (starting in September 2026, compensated through ID Public Relations) (collectively the "PR Defendants") to retaliate against Plaintiff as part of an ongoing civil conspiracy that began in 2025.

8. In March 2025, Blake Lively and Ryan Reynolds hired the CIA's former deputy chief of staff Nick Shapiro to advise on suppressing pro-Baldoni content creators on TikTok and other social media platforms. Through his company Maximum Effort, Reynolds funded

---

[1] Plaintiff has spoken publicly about the fact that, between the ages of 5 and 7, she was sexually assaulted hundreds of times by a relative. As a result, Plaintiff has had a lifelong struggle with what would later be diagnosed as PTSD, complex PTSD, severe anxiety, and major depressive disorder. Beginning in 2017, Plaintiff's mental health deteriorated to the point where she became physically unable to perform everyday tasks. Eventually, with her life in jeopardy, Plaintiff was required to take medical leave from work and began an outpatient treatment plan which included dialectical behavior therapy for trauma survivors, cognitive behavioral therapy, and antidepressive medication. In or around March 2020, Plaintiff filed for personal bankruptcy because of the medical bills she had accrued and, although she continued to practice commercial litigation, she ultimately retired from commercial litigation in the summer of 2023. Plaintiff then worked as a legal recruiter before transitioning to career coaching and litigation consulting. In late 2025, she began creating social media content to supplement her income.

[2] In this video, and others, Plaintiff disclosed she is a child sexual abuse survivor and, in addition to benefiting from therapy, has developed a personal interest in learning about the neurological impacts of early childhood trauma.

Shapiro's efforts by paying Shapiro's company, 10th Avenue Consulting, LLC, for all its work and work performed by subcontractors interfering with "pro Baldoni" social media content creators.

9. Lively and Reynolds also directed their publicist Leslie Sloane to assist Shapiro's efforts. Through his company Maximum Effort, Reynolds funded Sloane's efforts by paying Sloane's company, Vision PR, for all work and work performed by subcontractors interfering with "pro Baldoni" social media creators. Together with Sloan, Shapiro formulated a strategy to "shadowban" (the "shadowban strategy") pro-Baldoni content creators by engaging in algorithmic suppression, visibility filtering, and ghosting efforts designed to preclude their videos from getting views.

10. In or about April 2025, Sloan and Shapiro identified the following (non-exhaustive list of) content creators:

a. From YouTube: Linet Keshishian, @existingtothrive, @AshleyBrianaEve, @Trendingnews-s1x, @JZEYNews, @KassidyOC, @sweetandsaltylin, @AstrologywithJanessa, @PopcornedPlanet, @celebsfusion, @FameKeFasaane, @WithoutACrystalBall, @LethalLauren904, @SpillSesh, @annaoop, @Flaawsometalk[3], @boppingyt

b. From TikTok: @user6723486612442, @usernamethe.news410, @pop.diaries, @opinionsthataremine, @masked.realities, @lilylisaaaaaa, @lesliee.mg

c. From X Corp: @AestheticCyn, @zeyzeyspotted, @ThomasWhis53350, @swiftiefor3v3r, @spiritualshift_, @nyexposednews, @nicolette_sara, @NathalieNixson, @MediumSizeMeech, @Lxg19922022, @kirkxxs, @kiarajade200, @hte189, @Geniea8,

[3] Kjersti Flaa was subpoenaed as part of Lively's smear campaign against Flaa and Baldoni.

@feathersmodel, @exposedglobal, @Edepp98, @brujin_mde, @AlexKaseberg, @AsiasTweetybird

11. Next, in coordination with their employees and/or subcontractors, Shapiro and Sloane coordinated a massive, artificial wave of user reports against each creator.

12. Then they created "troll farms" that flooded each creator's videos with hundreds of community guideline flags in their respective social media platforms. In the spring and summer of 2025, numerous content creators including (but not limited to) @elsrich @boccegohawks, and @sweetandsaltylin made videos discussing that, after Shapiro's March 2025 hiring, Pro Baldoni content creators noticed their videos were being suppressed, their views were dropping, and benign videos were being flagged as violating community guidelines. Collectively, many content creators called out Lively, Reynolds, and/or Shapiro and his connection to the CIA, because they realized only their Lively / Baldoni content was severely impacted.

13. On July 3, 2025, Lively and Reynolds took their plan against content creators further and Lively's attorneys subpoenaed Google in a New York federal court for account information (including names, emails, IP addresses, and financial data) belonging to 16 YouTubers and content creators. A federal subpoena to several high-profile individuals, including Perez Hilton, Candace Owens, and Megyn Kelly, along with almost 100 other content creators or commentators was also filed. Content creator, Andy Signore of Popcorned Planet was also subpoenaed. Signore has now made a documentary series entitled *It Ends With Justice* that documents not only his extensive, stressful experiences and legal battles with Lively and Reynolds but includes interviews with film crew and others from the *It Ends With Us* production to discuss Lively's on set behavior.

14. Since the documentary features yet another version of the *It Ends With Us* controversy that Lively and Reynolds would like to suppress, it is likely that Reynolds and Maximum Effort are tortiously interfering with Signore's prospective economic opportunities and preventing Signore from finding a distributor.

15. Defendants' civil conspiracy is designed to interfere with the economic opportunities of hundreds of content creators who speak critically of Reynolds and Lively and/or favorably about Baldoni. The civil conspiracy, funded by Reynolds through his company Maximum Effort, functions in multiple stages. First, the PR Defendants identify content creators for "weaponized reporting." That is, they work with employees at their respective companies or hire subcontractors paid by Maximum Effort, to coordinate a massive, artificial wave of user reports against a single creator account in a short window of time.

16. Second, the PR Defendants engage in "dark PR/astroturfing," which involves Maximum Effort paying bot networks and/or using fake accounts to manipulate platform metrics, mask their identity, or trigger moderation alerts. These efforts are also referred to as "troll farms" that flood a creator's videos with hundreds of community guideline flags (such as 'harassment,' 'bullying,' or 'hate speech'). The PR Defendants' conduct triggers automatic a social media platform's community guidelines suspension for repeat violations although videos do not violate guidelines. The PR Defendants' conduct also overloads and, in essence, corrupts an account's data as the social media platform algorithm is manipulated.

17. As a direct and proximate result of the PR Defendants' conduct, the platform's automated system then "shadowbans" or algorithmically restricts a creator's reach (e.g., blocking them from the TikTok 'For You' page or YouTube recommendations).

18. All Defendants refer to this civil conspiracy as the "shadowban strategy" for the

ultimate impact that is achieved. Since at least May 2026, Lively and Reynolds have instructed the PR Defendants to employ these tactics against Plaintiff because of her coverage of the highly publicized dispute between Lively and Baldoni, which has spawned four federal lawsuits.[4] Plaintiff has been economically harmed by these efforts because she, like all creators, relies on momentum and platform algorithmic trust, to earn income. Losing visibility means losing ad revenue shares, access to programs like the YouTube Partner Program and TikTok Creator Program, short-form creator funds, and live-streaming virtual gifts.

19. Corporate brands use automated software to audit a creator's account health before hiring them. The PR Defendants' consistent flagging of Plaintiff's account for "harassment," and "community guideline violations," has resulted in Plaintiff's profile being flagged as "brand unsafe" by at least two brands, Garnier USA and NARS Cosmetics. As a result, Lively and Reynolds, through the PR Defendants, have also cost Plaintiff brand opportunities. Once a platform's algorithm categorizes an account as "high-risk," it can take months of clean posting to regain normal reach. Clean posting, however, would require Lively, Reynolds and the PR Defendants to stop their behavior. To date, all Defendants are continuing their conduct against Plaintiff, and her account continues to be categorized as "high-risk."

20. Defendants' conduct has not only suppressed at least five months of ongoing content from May 2026 to present, Defendants have also suppressed continued distribution of all of Plaintiff's content related to the Lively / Baldoni dispute since January 2026. Since distribution via platform algorithm is based on topic and trends, not date of initial publication,

[4] *Lively vs. Wayfarer Studios, LLC*, 1:24-cv-10049, District Court, S.D. New York; *Wayfarer Studios, LLC vs. Lively*, 1:25-cv-00449, District Court, S.D. New York; *Stephanie Jones vs. Jennifer Abel*, 1:25-cv-00779, District Court, S.D. New York; *Wallace vs. Lively*, 1:25-cv-00163, District Court, W.D. Texas.

Plaintiff has been damaged in an amount exceeding $75,000.

## BACKGROUND[5]
## THE FIRST AMENDMENT IS UNDER ATTACK BY CELEBRITIES SILENCING CONTENT CREATORS

21. "Shadowbanning is a cross-platform light, insidious social media censorship technique whereby platforms avoid recommending or outright hide, content and profiles from their main discovery feeds," which necessarily impacts the visibility, earnings, mental health, and communications of the users." [6]

22. Politicians and celebrities with a keen interest trying to protect their public images have started targeting individual accounts of content creators and *triggering* a shadowban of an account that was otherwise visible. The practice is so common amongst celebrity public relations teams that Lively herself accused Baldoni and Wayfarer of engaging in these tactics by shadowbanning "pro Lively" content creators and engaging "bots" to damage her reputation online. Indeed, according to Lively's attorney, Esra Hudson," a "core component of Ms. Lively's

[5] The Streisand effect is a phenomenon where attempts to hide, remove, or censor information unintentionally amplify public awareness and cause the information to spread far more widely. Lively and Reynolds' conduct against Plaintiff has caused this lawsuit and, in essence, has amplified the public's awareness of all the contract and legal issues they sought to suppress.

[6] Sena A. Kojah, Ben Zefeng Zhang, Carolina Are, Daniel Delmonaco, and Oliver L. Haimson. 2025. "Dialing it Back:" Shadowbanning, Invisible Digital Labor, and how Marginalized Content Creators Attempt to Mitigate the Impacts of Opaque Platform Governance. Proc. ACM Hum.-Comput. Interact. 9, 1, Article GROUP12 (January 2025), 22 pages. https://doi.org/10.1145/3701191

claims center on" Wayfarer, Baldoni and related defendants' "digital media smear campaign, which sought to manipulate the media landscape using 'untraceable' sources to paint Ms. Lively as the aggressor, instead of the victim."[7]

23. Lively's penchant for accusing others of behavior she engages in herself is the only impressive thing about her. Lively filed a lawsuit against Justin Baldoni and related defendants under false pretenses and perpetuated a fraud on the court and the general public. Then she, and her attorneys, (in a very Trumpian way) decided to call anyone pointing out the truth of her tortious behavior as participating in a "smear campaign."

**BLAKE LIVELY IS A BULLY, A LIAR AND A FRAUD**

24. In May 2019, Baldoni acquired the film rights to the novel *It Ends With Us* from its author, Colleen Hoover ("Hoover"). Wayfarer Studios ("Wayfarer") is an independent film and television production and financing company founded by Baldoni and Steve Sarowitz, and in 2022, it incorporated *It Ends With Us* Movie, LLC ("IEWUM") to develop and produce the Film. Soon thereafter, it partnered with Sony Entertainment to co-finance and distribute the Film.

25. On September 15, 2022, around the same Baldoni and Wayfarer were getting ready to make It Ends With Us, Lively appeared at a Forbes Power Women Summit, where she publicly admitted that she lies to get cast in films. Framing her fraud as "female empowerment," she said "when I would show up on a set, I knew that they just wanted me to show up and look cute, and stand on a little pink sticker, where I'm supposed to go and say what I'm supposed to say, . . . when I went in the meetings, I would just seem like I'm just there to be the actor and ready to get the gig. I wouldn't reveal that I actually need to have authorship in order to feel

[7] 1:24-cv-110049, Document 449, July 18, 2025, Letter from Lively attorney Esra A. Hudson to Judge Lewis J. Liman (emphasis in the original)– https://storage.courtlistener.com/recap/gov.uscourts.nysd.634304/gov.uscourts.nysd.634304.449.0.pdf

fulfilled, so I think that for them sometimes that might have felt like a rug pull because you're like 'you're trying to assert yourself into something that we didn't hire you to do.'"[8]

26. In December 2022, while pregnant[9] with her first son, Lively met with Baldoni and, as she had admittedly done to others many times in the past, she lied to him about her intentions, did not disclose that she or Reynolds would need "authorship" of the project.

27. She did not disclose that she would "work tirelessly to earn the title of producer"[10] once she was hired. Baldoni fell for the con[11] and offered Lively the film's lead role, Lily Bloom, opposite of Baldoni as co-lead in the role of Ryle Kincaid.

## <u>FILMING AND PROMOTING *IT ENDS WITH US*</u>

28. During a break in filming, Lively complained about inappropriate behavior during the filming of a "dance scene" when the script did not specifically call for any kissing or simulated intimacy.

29. This "dance scene" was the centerpiece of Lively's December 2024 lawsuit against Baldoni. In his April 2, 2026, opinion dismissing all of Lively's claims against Baldoni and the individual defendants, Judge Liman of the Southern District of New York, discussed the

---

[8] Blake Lively: Taking the Entrepreneurial Stage, 2022 Forbes Power Womens Summit: https://www.forbes.com/video/6312607947112/blake-lively-taking-the-entrepreneurial-stage--2022-forbes-power-womens-summit/ (12:11)

[9] Two years later, in December 2024, Lively sued Baldoni and one of her claims against him was that during this conversation, Baldoni volunteered that he was circumcised. In holding that the incident did not contribute to a hostile work environment, Judge Liman of the Southern District of New York noted that, since she was pregnant with her first son, she had likely initiated the conversation that led to Baldoni's statement. Liman also noted the conversation could not contribute to a hostile work environment because, at that point, she had not yet been cast in the film. *See Lively vs. Wayfarer Studios, LLC,* 1:24-cv-10049, District Court, S.D. New York (Opinion and Order, April 2, 2026, at page 109). https://www.nysd.uscourts.gov/sites/default/files/2026-04/24-cv-10049%20Opinion%20and%20Order%20-%204.2.26.pdf

[10] In a June 25, 2024, letter to the Producers Guild of America (discussed *infra*), Lively asks for a "producer tag" because she had been worked "tirelessly" to earn the title for a year and a half. That timing puts her intention to become a producer at the December 2022 meeting with Baldoni.

[11] Text communications between Taylor Swift and Blake Lively reveal that, as early as April 2023, Lively referred to Baldoni as a "clown," "doofus," and "loser" who "thinks he's a writer." Notably, at no point were any texts discovered where Lively described Baldoni as harassing or as a predator.

"dance scene" by stating: "[t]here is no question that this conduct might support a hostile work environment claim 'if it occurred on the factory floor or in the executive suite.' [Baldoni] was acting in the scene. Assuming he was improvising, the conduct was not so far beyond what might reasonably be expected to take place between two characters during a slow dancing scene such that an inference of hostile treatment on the basis of sex would arise[.]"[12]

30. Lively also complained that Baldoni had created a hostile work environment based on her gender because Baldoni had discreetly asked the film's personal trainer how much Lively weighed.

31. Judge Liman rationally concluded that "Lively's complaints of 'fat-shaming' also could not reasonably support a claim [of a hostile work environment]. Shortly before work on the Film began, Lively gave birth to a child. She expressed to Baldoni that she 'want[ed] to be in [her] best shape' for filming. On or around April 23, 2023, before principal photography began, Baldoni asked a personal trainer he had consulted with, and who was working separately with Lively, if the trainer knew what Lively would weigh when filming began. Baldoni's question then found its way back to Lively, who felt 'disturbed and unsettled that Baldoni was soliciting information about [her] weight.'"[13] Judge Liman explained "Lively herself recognized that achieving a 'certain aesthetic' was 'part of the job that we both excitedly signed up for.' She asked Baldoni if they could do 'the body scenes at the end of the schedule' so that she would have sufficient time to work out, she wrote to her agent privately that she was 'working out twice a day, 4 hours a day' in order to lose weight and set the movie up for success, as the 'sexiness in

[12] *Lively vs. Wayfarer Studios, LLC,* 24-cv-10049, Lewis J. Liman, District Court Judge, Opinion and Order, April 2, 2026, at page 109. https://www.nysd.uscourts.gov/sites/default/files/2026-04/24-cv-10049%20Opinion%20and%20Order%20-%204.2.26.pdf

[13] Id.

this film and the marketing I'm sure, is critical to its success,' and she told Baldoni, 'My husband and I both look at certain roles as athletic events. And this is one of them. . . . And that's great[.]' Given these statements, Baldoni's actions—even if they could be viewed as gently pushing Lively to lose weight, which is not necessarily supported by the evidence—could not fairly be described as discrimination 'because of' Lively's gender."[14]

32. The *single most important fact* relevant to Lively's claim that Baldoni hired PR to "retaliate" against her for complaining about these "incidents," is that at no point after Lively's November 2023 complaint or after her issues were admittedly resolved in January 2024, did Baldoni or Wayfarer call PR or crisis management to retaliate against her for her complaints.

33. In the opinion vindicating Baldoni and dismissing all individual defendants from Lively's lawsuit, Judge Liman took pains to specifically tie Baldoni's communications to PR with Lively and Reynolds' conduct in May, June, July, and August 2024.[15] In May 2024, five months after Lively's concerns from 2023 were resolved and three months before the premiere of the film *It Ends With Us*, Reynolds (who has 44 million Instagram followers) unfollowed Baldoni. Judge Liman explained that afterwards, Baldoni worried that Lively might [also unfollow him] to "plant seeds" and "give crumbs" [about Lively's baseless 2023 claims] so that "fans would go 'digging.'" He therefore asked his publicist, Jennifer Abel, to formulate a "real plan" in case that happened so that he could "feel at ease."[16]

34. Judge Liman noted that Baldoni's concerns continued to escalate after other cast members appeared at a June 15, 2024 "book bonanza" without him. Two days later, Baldoni and Abel had an hour-long call in which he asked for recommendations for attorneys. Heath also

[14] Id.
[15] Id. at 117.
[16] Id.

asked Mitz Toskovic ("Toskovic"), Wayfarer's Vice President of Operations, to start compiling a timeline document regarding all of the alleged incidents.[17] On June 25, 2024, six months before suing Baldoni, Lively submitted a five-page, single space, *multiple font*[18], 77-bullet letter to the Producers Guild of America ("the PGA letter")19 that proves that Lively knew she was an independent contractor at the time she brought her lawsuit against Baldoni. Unsurprisingly, Judge Liman quoted many of the bullets when dismissing all claims Lively brought under Title VII (a law designed to protect employees).

35. In July 2024, after publicly taking credit for the entire film, Lively did as Baldoni feared and unfollowed him, alerting her 40 million Instagram followers to a conflict. That month, Hoover and the film's cast also unfollowed Baldoni at Lively's request.[20]

36. On July 26, 2024, and just eleven days before the premiere for *It Ends With Us*, Reynolds' film Deadpool and Wolverine premiered in the United States. The film is the most commercially successful vehicle for a targeted smear campaign in Hollywood history. Reynolds made bullying a family affair and, in addition to unnecessarily traumatizing his 7-year-old in a Kidpool subplot, Lively portrayed a character named Ladypool, while Reynolds portrayed the character Nicepool, which is a cruel caricature of Justin Baldoni.

---

[17] Id.

[18] In the letter, instead of just changing the font, Lively writes: "I'm changing the font to make the read as easy as possible." Plaintiff has made videos explaining why that sentence leads her to believe Lively's lawyers did not know about the PGA letter doomed their December 2024 lawsuit before it was even filed.

[19] https://storage.courtlistener.com/recap/gov.uscourts.nysd.634304/gov.uscourts.nysd.634304.1233.14.pdf

[20] Although Lively testified under oath that she did not ask Hoover to unfollow Baldoni, Lively appears to have committed perjury on this issue, as well as others, which was a primary motivation for her to settle her remaining claims in May 2026.

[21]

37. In one scene, Reynolds references the Lively "fat-shaming" incident when, as Nicepool, he talks about Lively's character, Ladypool, by saying: "She is gorgeous. She just had a baby too, and you can't even tell." Later, Nicepool says he could make the comment because he "identifies as a feminist."[22] Ultimately, Nicepool suffers a gruesome death after being shot hundreds of times until he is eventually decapitated.

38. Imagine. Even though Lively herself had initiated conversations with Baldoni about her weight, even though Lively had acknowledged there was an aesthetic expectation for actors in movies, and even though Lively communicated about her weight to Sony executives, Baldoni's single question to a trainer led to Baldoni being bullied in a movie that went on to earn *$1.3 billion globally*.

39. On August 3, 2024, *It Ends With Us* premiered and on the red carpet, Lively admitted that she and Reynolds had just pulled off one of the biggest frauds in Hollywood history because it was Reynolds, and not Lively, who had authored the "roof scene" that made the final cut of the film. After all her talk about needing "authorship to feel fulfilled," Lively admitted lying to Baldoni, Sony and the Producers Guild of America in the PGA letter. Sony

---

[21] Left – Reynolds; Right – Baldoni. Interestingly, despite having his then 7-year-old screaming sexually inappropriate dialogue, Reynolds subsequently referred to *Baldoni* as a "predator and sociopath" when communicating with Hollywood executives.

[22] Baldoni hosts *The Man Enough Podcast*, a series that explores modern masculinity, relationships, fatherhood, mental health, and rigid gender roles. It's tied to his book, *Man Enough: Undefining My Masculinity*.

executives were stunned and immediately sent Reynolds a contract to address the fact that his intellectual property had been incorporated into the film.

40. Conveniently, Lively's December 2024 lawsuit pretended as if August is the second month of the year. In its simplest form, it said, "I complained about conduct, we signed an agreement in January, then "immediately afterwards," he called PR to retaliate against me in August only because of that January meeting." Lively's lawsuit conveniently omitted key facts. It omitted the fact that after Lively complained about issues, those issues were addressed. It omitted the fact that in May 2024, Reynolds alerted 44 million Instagram followers to a conflict when he unfollowed Baldoni. It omitted the fact that, in June 2024, Lively took public credit for the film in her PGA letter. It omitted the fact that the cast made a significant public appearance at a June book-bonanza without Baldoni. It omitted the fact that Lively, Hoover, and the cast had unfollowed Baldoni in July 2024. It omitted the fact that, also in July, Reynolds made Baldoni the butt of a worldwide joke in a movie that grossed more than $1.3 billion. It omitted the fact that Baldoni was put in the basement during the August 2024 premiere for what was supposed to be his directorial debut. It omitted the fact that Lively confessed at the premiere that she and Reynolds had committed fraud when she passed off his intellectual property as her own.

41. It omitted the fact that it was after these events that Baldoni called PR and not after her 2023 complaints or after the January 2024 meeting. Had these facts been included, the case would have been immediately dismissed because there were so many intervening factors, closer in time, to the harassment Baldoni faced before his lawful hiring of PR, there was no way to state a claim upon which relief could be granted. Even Judge Liman acknowledged that "[t]he Wayfarer Parties were entitled to engage public relations and crisis management specialists to protect their reputations." In a very real way, Lively committed a fraud on the court, the public,

and unconscionably wasted judicial resources by filing a lawsuit under false pretenses.

42. Although *It Ends With Us* was an immediate commercial success, and despite the effort put into disparaging Baldoni, it was Lively who was facing negative backlash in August 2024 for her behavior during the film's press tour. At one point, a Sony executive called Lively "epic level stupid," because while she was promoting a movie about domestic violence, she also promoted her new haircare line and encouraged women to "wear their florals" to watch a movie about a woman being abused. Lively also faced renewed backlash over her and Reynolds' 2012 decision to get married on a former slave planation named Boone Hall.

43. Slaves there were forced into antebellum brick slave quarters that packed up to 15 people in each small cabin, forcing families into hyper-congested, unsanitary living spaces with zero privacy. Ryan Reynolds and Blake Lively's wedding guests dined facing these quarters.

44. Perhaps the biggest impetus of negative publicity for Blake Lively in August 2024 was when Norwegian entertainment reporter, Kjersti Flaa ("Flaa"), posted a 2016 interview with Lively on social media.[16] The same day as the interview, Lively had confirmed her pregnancy and publicly debuted her "baby bump" on the red carpet during the *Café Society* premiere in Cannes, France. A short while later, Lively and her co-star Parker Posey ("Posey") sat down with Flaa, who began the interview by congratulating Lively, saying: "First of all, congrats on your little bump." Lively immediately responded with disdain and unkindly retorted, "congrats on your little bump!" It is impossible to convey in writing how instantly uncomfortable the interview becomes. Flaa, who is unable to have children, looked visibly pained as Lively and Posey made fun of her, with Posey going so far as to rise from her seat to show Flaa her rear end.




45. Lively and Posey then continue to mock Flaa's statement before Flaa tried again, asking "visually [the movie] is amazing. Did you guys love wearing those kinds of clothes?

46. Although Posey started answering the question, Lively interrupted, turned away from Flaa and asked Posey, "I wonder if they would ask the men about the clothes." The women then carry on a faux conversation about the men's wardrobe as Flaa watches in silence. Eight years later, in August 2024, Flaa had a conversation with a colleague who had a similar interview experience and, hoping to start a conversation about professionalism, she spontaneously decided to post the 2018 interview. The video instantly went viral, garnering more than 7 million views. Despite the fact that Flaa has always insisted that her post was spontaneous, and despite the fact that there has never been any evidence to the contrary, Lively has repeatedly defamed Flaa by providing false information to the New York Times (which was subsequently published), claiming that Flaa uploaded the interview as part of Baldoni's plot to retaliate against Lively for making sexual harassment allegations against him. Under the guise of feminism, Lively bullied Flaa for congratulating her on her pregnancy eight years before publicly accusing Flaa of being the kind of woman who would retaliate against another woman reporting sexual harassment.

**BALDONI'S PUBLICISTS BETRAY HIM**

47. Since 2020, Jonesworks (a well-known New York-based public relations firm), and its owner, Stephanie Jones, worked as Wayfarer's "exclusive public relations counsel" and

to "provide strategic communications services" to Wayfarer. For almost four years, Jonesworks' work for Wayfarer was managed out of Jonesworks' Los Angeles office by Jennifer Abel ("Abel"). In the summer of 2024, to deal with the Lively PR issues, Wayfarer and Baldoni hired Melissa Nathan ("Nathan") as their crisis management expert. Around the same time, Abel gave six weeks' notice to Jones and Jonesworks that she intended to resign and later that she intended to start her own firm.

48. Despite giving six weeks notification, twice verbally and at least once in writing, and despite the fact that she knew her personal number, personal data, and personal information were on a company owned phone that she would need to return before leaving, Abel did not take any proactive steps to transfer her personal data to a different device. Three days before her scheduled last day, Jones decided to terminate Abel, effective immediately, and had her turn in her phone. Shockingly, Abel still had not deleted a single text message, email, stored credit card, photo, or any of the other forms of personal data from her company owned phone

49. When Jones opened Abel's phone and saw that nothing had been deleted, she went through the phone and found text messages between Abel and Nathan disparaging both Jones and Baldoni. Similar to Lively, who texted Baldoni kind messages while making fun of him to Taylor Swift, Abel and Nathan made fun of Baldoni to each other while texting him kind messages and manipulating him. Melissa Nathan and Abel also exchanged text messages about an unflattering article they coordinated about Jones, with Abel calling Jones a "cunt." Once Jones saw the full contents of Abel's phone, Jones formulated a plan to essentially "launder" the text messages while turning them over to Lively.

50. On September 27, 2024, Lively and Reynolds (after coordinating with their

counsel and Jones) initiated a sham lawsuit in New York state court[23] then used that lawsuit to generate a subpoena pursuant which the communications were turned over. On or about October 1, 2024, just four days later, Jones turned over the entire contents of Abel's iPhone and cloud-stored communications a second time to Lively and, through Lively's attorneys, the information was sent to the New York Times.

51. The New York Times then used the information to generate an "explosive" article.

52. Essentially, Wayfarer and Baldoni were accused of retaliating against Lively in August 2024 because she raised sexual harassment concerns, which were addressed and resolved in January 2024. The article completely omitted any of the harassing behavior Lively and Reynolds subjected Baldoni to in the months before he called a crisis management team. In essence, Lively and Reynolds had the benefit of discovery before filing a lawsuit and manipulating the facts to fit their narrative. Since Jennifer Abel never took a single step to safeguard her personal information for over five weeks after giving Jones notice and did not delete a single text message disparaging Baldoni or Jones, Abel essentially gave Lively all that was needed to defeat the purpose of being Baldoni's publicist.

53. Abel, Nathan, and Jones[24] were supposed to protect Baldoni's image and reputation, yet thanks to all three of them, they provided Lively with ammunition to try to ruin his personal life and professional reputation because they allowed Lively to take their communications out of context to spin a false narrative about him. Although Lively's case was largely dismissed in April 2026, it took 15 full months to reach that result. Between January

[23] *Vanzan, Inc. vs. Does 1-10, inclusive*, Supreme Court of the State of New York, County of New York (Index No. 655130/2024).

[24] Jones is currently suing Abel and Nathan, and all three women continue to point the finger at each other instead of themselves for the unprofessionalism that ruined their own careers.

2025 and March 2026, Lively used her lawsuit to publicly accuse Baldoni of being a retaliatory predator.

**BALDONI'S ATTORNEY IS SANCTIONED WITH A REPRIMAND FOR FAILING TO STATE A CLAIM AND THROWING AWAY HIS AND WAYFARER'S CONTRACT CLAIMS AGAINST LIVELY AND REYNOLDS**

54. First, Baldoni was betrayed the Lively, the person he hired to act as his costar. Then he was betrayed by his publicists. The trifecta was completed when Baldoni was failed by his attorneys who got the contract claims Lively and Reynolds had giftwrapped for Baldoni and Wayfarer thrown out of court.

55. The Many-Worlds Interpretation (MWI) of quantum mechanics is a theory that states every time a quantum event has multiple possible outcomes, the universe splits. In essence, every possible outcome that can possibly happen actually happens, occurring in its own separate, non-interacting "branch" or parallel universe.[25] Plaintiff likes to imagine an alternate universe where Baldoni's lawyers knew what they were doing. They filed a motion to dismiss Lively's Title VII claims, attaching the PGA letter, and arguing was an independent contractor not covered by the law. They filed a motion to dismiss Lively's California claims arguing a lack of nexus because Lively was a New York resident, filming occurred in New Jersey, and the only contract that referenced a California choice of law provision, the Actor Loanout Agreement, was unsigned and unenforceable. They filed a motion to dismiss the breach of the Actor Loanout Agreement for the same reason.

56. All of those claims were dismissed by Judge Liman at the summary judgment

[25] https://www.nbcnews.com/mach/science/weirdest-idea-quantum-physics-catching-there-may-be-endless-worlds-ncna1068706

stage and were capable of being dismissed at the very beginning. Had Baldoni's team done that, Lively would have been left with a single breach of contract of the Contract Rider Agreement, which provided that Wayfarer would not be "sarcastic" in response to Lively's complaints. All individual defendants would have been immediately dismissed. Plaintiff also likes to imagine an alternate universe where Baldoni's lawyers knew what they were doing and sued both Reynolds and Lively for tortious interference of Baldoni/Wayfarer's contracts with Sony and Colleen Hoover, and Lively for fraud in the inducement of the Offer Letter. She imagines the narrative in the public for the last 15 months was not that Baldoni was a "predator," but that Lively is a fraud who lies to get roles, then lies to pass off her husband's intellectual property as her own, while they both pass off the entire thing as "feminism".

57. Plaintiff likes to imagine an alternate universe where the narrative in the public is that Lively and Reynolds took over the film *It Ends With Us*, Reynolds made a cruel caricature of Baldoni after unfollowing Baldoni, Lively unfollowed Baldoni, the cast unfollow Baldoni, and at the premiere, Lively and Reynolds put him and his guests in the basement. Plaintiff likes to imagine an alternate universe where the public immediately understood that Baldoni's retaining of public relations/crisis management who promised "we can bury anyone" was in response to people trying to bury him. Instead, we're in this universe and in *this* universe, Baldoni's lawyer sued for *extortion and defamation,* declined to file any motion to dismiss and allowed his client to spend 15 months getting publicly eviscerated and discussed in the context of sexual harassment and retaliation. Baldoni's lawyer also blindly accepted the proposition that California law applied even though his team later filed a motion for judgment on the pleadings at the end of 2025, months after discovery closed, arguing California law was inapplicable.

58. In *this* universe, Baldoni's breach of contract and tortious interferences claim was

dismissed when Judge Liman noted that the complaint did not even identify which contract had been breached or interfered with. Baldoni's attorneys declined an opportunity to amend the complaint to save breach of contract and tortious interferences, even though Judge Liman specifically allowed the amendment in dismissing the other claims. Baldoni's attorney then told the public it was better to throw away the contract claims that were essential to his entire case so that they could "preserve appeal for the Second Circuit."[26] Eventually, Baldoni's lawyer received the extremely rare sanction of a reprimand for writing a complaint that was more than 200 pages long[27], that had failed to state a single claim upon which relief could be granted, and for failing to save Baldoni's contract claims.

## ***SELLING SUNSET* AND THE SELLING SANITY PODCAST**

59. In September 2025, and a few months later in November, in advance of the 9th Season of the show, Plaintiff began making TikTok videos discussing the Netflix reality tv show, *Selling Sunset.* The show debuted in 2019 and follows the real estate brokerage The Oppenheim Group (owned by Brett and Jason Oppenheim and located on Sunset Blvd.) and its all-female office of real estate agents.

60. Plaintiff had begun watching the show during the pandemic and followed the cast on Instagram in early 2020. At that point, Plaintiff had less than 600 followers and did not actively post but used it to follow the show's cast, other celebrities and news outlets, comedians, etc. In 2020, the *Selling Sunset* cast members were not extremely well known and were very open about their lives and interactive with fans on social media. Although she did not have a large following, Plaintiff interacted with numerous cast members over the years and cultivated

[26] Seriously.
[27] The lawsuit also attached a 168-page document entitled "Timeline of Relevant Events" which was duplicative of the complaint and which Judge Liman said he could not lawfully consider as the timeline was not an exhibit.

"behind the scenes" relationships. The cast, however, had not been particularly active on TikTok so when Plaintiff began making content on that platform about the show in 2025, it quickly went viral.

61. For example, Season 2 of *Selling Sunset* prominently featured a home named "Laurelwood" and was included in a storyline whereby cast member Chrishell Stause ("Stause") was made to look as if she had found the listing herself and sold it on her own. In Season 6 of *Selling Sunset*, there is a confrontation between Stause and fellow real estate agent and new cast member, Nicole Young ("Young"). While trying not to break the fourth wall, Young said she was upset Stause had taken marketing credit for selling Laurelwood when Young (who had been with the Oppenheim Group for over a decade) had actually sold it.

62. After watching the episode, Plaintiff made an Instagram video in May 2023 explaining the dispute and found online proof that the "Laurelwood" house from Season 2 had really been Young's listing. At the time, several cast members "liked" the post and confirmed Plaintiff's account, yet the video got almost no views on Instagram.

63. More than two years later, Plaintiff made a nearly identical video explaining the same scenario, and it immediately received 286.2K views. Encouraged by the response, Plaintiff decided to make videos about the showing, discussing legal issues that Plaintiff noticed following some problematic plotlines. In one video summarizing facts for the upcoming season of *Selling Sunset*, Plaintiff spontaneously said: "I am a litigator. I collect facts like snacks!" The video garnered more than 864.6K views and "I collect facts like snacks!" became Plaintiff's catchphrase.

64. Plaintiff has made videos discussing sexual harassment, gender and pregnancy discrimination on *Selling Sunset*. For instance, business owner Jason Oppenheim ("Oppenheim")

has famously been romantically involved with half of his Los Angeles office, to the point where he once refused to mediate the "Laurelwood" feud between Young and Stause because they were both "former girlfriends." In early seasons, the female agents who had not been romantically involved with Oppenheim frequently complained about his blatant favoritism of Mary Bonnet ("Bonnet"), another former girlfriend. In later seasons, new cast member Bre Tiesi wondered if one needed to provide sexual favors to Oppenheim to work in the office. In another episode, Oppenheim immediately said "no" to the idea of incorporating a nursing room into a brand-new office that was being constructed. That attitude was reflected with long time cast member Heather El Moussa was unceremoniously fired immediately after having a baby.

65. Plaintiff made videos explaining that reality tv cast members can lie about each other, accuse each other of crimes, and insist that the lies are truthful (in essence, cast members can commit slander) but the cast members waive the right to sue. Plaintiff made videos explaining that beginning in Season 6 and continuing each season until Season 9, Stause repeatedly – and falsely – claimed that Young was either actively on drugs on camera or had previous used drugs. Although Stause's statements meet the legal definition of "defamation," Young is unable to sue because of the waiver that all of the cast members signed.

66. Plaintiff has noted that despite the fact that Stause claimed to have been raised by addict parents, Stause bullied Young for supposed "drug use" for several seasons while admittedly "covering" for other cast members' on camera cocaine use. Whether shaming or enabling, at no point has Stause conveyed any compassion for individuals struggling with addiction nor has she tried to intervene to get her friends help.

67. In Season 5, the show added Chelsea Lazkani. As a woman of British-Nigerian

descent, Lazkani was the first dark-skinned Black woman on the show and came with a Master's degree, real estate experience in the Malibu beach area of Los Angeles, and a husband who as a client of the brokerage. Despite her qualifications, Lazkani was the only woman forced to sell a $4 million house to earn a desk in the Los Angeles office. A video comparing Lazkani's interview process with the process Jason provided a white, blonde college graduate from Nashville with no knowledge of LA and, critically, no real estate license, has more than 2 million views on Instagram.

68. Seeing parallels between her legal career and Lazkani's experiences, Plaintiff made numerous videos describing how Lazkani had been subjected to micro and macro aggressions since joining the show.

69. On October 30, 2025, Plaintiff posted a video explaining that in Season 9 of *Selling Sunset*, Bonnet (while seemingly under the influence of narcotics) had exhibited racist behavior towards co-star Lazkani in several episodes. In a now infamous "flower delivery scene," Bonnet flew into a rage, broke the fourth wall, disrupted filming, yelled at production, and threatened to "commit murder" of Lazkani who had sent her a flower arrangement.

70. In that episode, and during Bonnet's meltdown at production, her husband Romain Bonnet says that's "Scary Mary coming out." The season finale of the show is also called "Scary Mary." The use of that phrase is significant because it is Bonnet's nickname (given to her by her friends) when she is high on cocaine, because her behavior becomes erratic and unpredictable. During the final episode, with the entire cast gathered for a dinner, Bonnet incoherently screams at Lazkani for the flower delivery before storming off and Oppenheim demanding that cameras be turned off.

71. After dinner, Oppenheim tried to film a scene with Bonnet where he fired

Lazkani. However, while cameras were rolling, Lazkani called them racist and, at that point, Oppenheim ordered that filming be stopped and he threatened to cancel *Selling Sunset* and its spinoff show, *Selling the OC*, if the production company aired footage of Chelsea Lazkani calling him and Mary Bonnet racist.

72. Since the seasons had already been mostly filmed, the production company and Netflix stood to lose money if Oppenheim went through with his threats. As a result, Season 9 ends with Bonnet asking Oppenheim to fire Lazkani without a resolution. Oppenheim, as an executive producer of the show, prevented footage of a Black woman calling him racist but he effectively outed his "best friend's" drug use during the final season.

73. On May 18, 2026, Plaintiff was the first person to announce that Bonnet, along with four other cast members, had been fired from *Selling Sunset*. TMZ follows Plaintiff on TikTok and after Plaintiff's announcement, TMZ confirmed with the firing before announcing the "exclusive." Although Plaintiff did not receive credit as the source for TMZ, her video on TikTok has more than 622K views and the same video has more than 1.1M on Instagram. Following the success of her social media videos discussing *Selling Sunset*, Plaintiff created a podcast named *Selling Sanity*, where she not only summarized her social media content into longer form episodes, but also began incorporating legal analysis in other pop culture discussions. It launched on November 10, 2025, and, by June 2026, Plaintiff's podcast peaked at #40-#48 on the Apple Top 100 podcasts in the Entertainment News subcategory and currently ranks in the top 100 podcasts in nearly a dozen countries.

74. Plaintiff's coverage of the Lively and Baldoni dispute primed her for increasing her public profile and income earning potential.

## PLAINTIFF ENTERS THE LIVELY / BALDONI CHAT IN JANUARY 2026

75. The first communication that Plaintiff discovered in the Baldoni/Lively litigation was an email that Lively sent to Ben Affleck ("Affleck") asking him to review "her edit" of the movie, *It Ends With Us*. Notably, Lively does not discuss any sexual harassment from Baldoni.

> Ben,
>
> It's Blake. Don't hang up.
>
> I hope life is treating you beautifully. Ryan was going on and on about you recently amongst all that chaos. He was blown away by you. Though he was equally effusive about your Dunkin' commercial. So know you have a Canadian fan club in my house. And a Burbank one too.
>
> I'm writing with a zero pressure ask. I've just come out the other side (well almost) of the most upsetting experience I've ever had on a movie. The making of doc of this film would be more interesting than the movie could ever be. It's like if Wild Wild Country, Fyre Festival and Going Clear had a baby with The Room .Room also works though.
>
> Anyway, I ended up rewriting and restructuring the entire script, I also ended up having to direct the movie via the chaotic clown "director"/actor/producer/financier/studio head at the center. Yes that's all the same person. Oh and did I mention he and everyone he had on the movie is in a cult. If I would've just formally directed it, it would've been much easier, but having to troubleshoot through his taste, ego and preexisting decisions made it so difficult and that's not even touching on any of the wild HR issues and beyond. Anyway, now I'm in a bake off with him in the edit. He's been editing since, I kid you not, July, and they gave me 10 days to do my own pass. We have a bake off in 12 days. But I have a friends and family preview in NY on Saturday in the meantime so I can get one round of notes or feedback before we duke it out.

76. On January 22, 2026, Plaintiff made a video discussing the communication and said: "it's just such a self-serving email. And there's, like, literally no interest in him and how he's doing. . . This email is just so classless and tacky. Just tacky."

77. Plaintiff then discovered the emails that both Lively and Reynolds sent to Damon and his wife, Lucy, disparaging Baldoni and asking them to review Lively's cut of *It Ends With Us*. On January 23, 2026, (also Plaintiff's 44th birthday), she made a reaction video to the Reynolds and Lively communications she had seen.

78. In the video, Plaintiff says: "So turns out Blake Lively and Ryan Reynolds are absolutely insane and Deadpool has been ruined for me, because, I thought this was a much smaller case than it is. Apparently, that email that Blake sent to Ben Affleck, she cut and pasted it and sent it to Matt Damon and his wife, and half of Hollywood, and Ryan Reynolds wrote damn near the identical thing. Here's my question. Do Hollywood actors not have lawyers on

retainer? Retainer![28] Do they not have lawyers on retainer? Who is advising these people? I have never in my seventeen-year career as an attorney seen emails this insane. And this damaging. See, I thought that this case was about Justin Baldoni hiring a bunch of, like, people to do bots or something like that to talk crap about Blake Lively in social media . . . "

79. But if Ryan Reynolds and Blake Lively are spamming Hollywood with this weird insanity and this weird story, I might hire people . . . I don't understand what's happening. I'm gonna have to take a closer look at this case. Suffice it to say, Ryan Reynolds is out of his, his gourd, but they're the perfect couple, because their insanity is nearly identical. Like, they're very narcissistic, they don't give a crap about who they're talking to, they've got this weird obsession with Justin Baldoni that doesn't seem healthy. So, it's not just poor Ben Affleck. It's poor Ben Affleck, Matt Damon, all of Hollywood, and all of the freaking viewers who now had Deadpool and other movies ruined because we realize that these people have lost their goddamn minds."

80. When Plaintiff began reviewing the pleadings from the Lively and Baldoni litigation, Plaintiff saw that Lively was being represented by Willkie Farr. Immediately, Plaintiff was convinced that Lively had lied to her attorneys to get them to represent her.

81. "Blake Lively 100% lied to her attorneys before they agreed to take her case. . . . And I just saw that Blake is being represented by this law firm called Willkie Farr. Willkie is a very, very good law firm. It's what, it's one of the 100 firms that are, like the top 100 firms that are referred to as Big Law. . . . Here's why I say Blake lied. . . . Big Law reputations are really important, and I just can't imagine that they knew in advance that Blake Lively and Ryan

[28] "Retainer!" was said in the voice of the character Chuck in *Good Will Hunting*.

Reynolds were this unhinged."

82. At the time, Sloan and Shapiro had never encountered Plaintiff before. This video was left alone and, without their "shadowban" interference, went viral on TikTok. As of the date of filing, it has since accumulated more than 1 million views with a total play time of 18,147h:59 minutes.

83. As Plaintiff continued reading the pleadings, she kept noticing a meme that had not been referenced in the Baldoni motion for summary judgment.




84. In February 2026, Plaintiff made a video saying "I'm afraid to ask but I haven't found it yet. So what is Never with teeth? What's never with teeth?" Plaintiff decided to make a video, which has more than 40K views on TikTok, that recorded her initial reaction to a text Lively sent Baldoni after completing what she referred to as "her pass" of the roof scene in the movie *It Ends With Us*.

85. "I opened the 'not with teeth' thing but I haven't read it yet. I was waiting for you guys . . . this is me, reading this text, okay? Blake to Justin Baldoni . . . If you knew me in person longer, you'd have a sense of how flirty and yummy the ballbusting would play. It's my love

language. Spicy and playfully bold, never with teeth (at this point, Plaintiff started to laugh) . . ."

86. "Wait. Yummy, the ballbusting would play, it's my love language, spicy and playfully bold, never with teeth? This woman is out of her fucking mind. I don't understand why he didn't sue her for sexual harassment." On February 13, 2026, one of Plaintiff's videos discussing the fact that Reynolds did not accompany Lively at a court ordered mediation was quoted in a Marie Claire, UK[29]

> However, according to one lawyer, Reynolds' involvement is likely the reason for his absence, speculating that Lively's legal team may have encouraged him not to attend.
>
> "Ryan Reynolds was not with Blake Lively at the settlement yesterday because he listened to her lawyers who told him to stay ... away," Ivy League lawyer Theresa Concepcion reported in a TikTok video to her 21.5k followers.
>
> Concepcion went on to allege that Reynolds had damaged Lively's case against Baldoni, reporting: "there were so many things that Ryan Reynolds did to Justin Baldoni himself that justify Justin reaching out to his PR team, that there's no legal way a jury is going to be able to find retaliation."
>
> She continued: "Since he ruined her case and since the public has had this huge backlash, Blake's lawyers know that it's really unlikely that Ryan Reynolds' presence would help in the court of public opinion.
>
> "If Ryan had shown up yesterday, the image might have been 'Ryan is showing up to defend his wife' and 'he should have been angrier.' And 'is he going to be bullying Justin Baldoni during the settlement negotiations?' So if I was Blake's lawyers, I would have said Ryan needs to [stay at] home. And he did."

87. Plaintiff's popularity continued into March and April 2026, and her videos continued garnering views ranging from 10,000 to hundreds of thousands, discussing the Lively and Baldoni litigation. She covered all topics ranging from Title VII sexual harassment and retaliation but also focused a great deal on the contract claims that Baldoni's lawyer had failed to save.

88. While waiting for the court's decision on Baldoni's summary judgment motion, Plaintiff was the only content creator who made videos accurately predicting that Judge Liman

[29] https://www.marieclaire.co.uk/celebrity-news/why-ryan-reynolds-missed-blake-lively-justin-baldoni-settlement-hearing

would dismiss the breach of the Actor Loanout Agreement since it was never signed, dismiss the Title VII claims and keep state retaliation alive[30], believing that Lively had established enough of a factual dispute to reach the jury. Plaintiff's prediction came true, and the only claims to survive summary judgment were two state retaliation claims and a breach of the Contract Rider Agreement.

89. In April 2026, Plaintiff attended the final pretrial conference in the Southern District of New York. In addition to having six associates sitting in the gallery, Lively's side brought 19 lawyers to sit at counsel's table. Lively's attorneys created a spectacle, and at one point, they even angered the bailiff because lawyers kept taking his water bottle off the chair and kept moving the chair he had designated for himself. On or about May 1, 2026, Blake Lively faced intense public and legal scrutiny regarding allegations of perjury, after late-stage filings and unsealed exhibits came to light. For example, during her deposition, Lively stated under oath that she never asked anyone to destroy or delete the raw footage ("dailies") from the movie *It Ends With Us*. However, a newly unsealed September 2024 message from a Sony executive explicitly noted that Lively requested the dailies be deleted. Lively also testified under oath that she never instructed author Colleen Hoover to unfollow Justin Baldoni on social media. Hoover's own deposition directly contradicted this, stating that Lively did tell her to unfollow him.

90. On May 5, 2026, the parties announced a settlement and Plaintiff made videos opining that Lively and Reynolds had likely agreed to secretly pay Justin Baldoni $100,000,000

[30] Judge Liman's decision noted, however, that Baldoni's attorneys had failed to raise an argument to dismiss retaliation. Namely, the judge had found there was no sexual harassment under California state law. If there was no sexual harassment, how can there be retaliation? The judge allowed the corporate defendants remaining (as the individuals had been dismissed) to supplement their briefing on that issue.

to settle her lawsuit against him two weeks before trial. Plaintiff imagined that Baldoni's lawyers at least knew how to play hardball.

91. "You don't want to testify that you committed perjury? You got our number. What's it gonna be, Blake? How about 80 million? A hundred. 85? A hundred. 90? A hundred. 92.5? A hundred. 95? A hundred. Listen! We're not gonna pay you $100 million! Then we're gonna go to fucking trial. A hundred million dollars. Can I put it on a payment plan? Yeah, you can put it on a payment plan, but we want a hundred million dollars."

92. Although both sides agreed that "no money changed hands" in the settlement, Plaintiff subsequently noted there are "no hands in wire transfers." After the settlement, high-profile attorney Mark Geragos started spreading misinformation and said that, after 10 out of Lively's 13 claims were dismissed, Lively's lawyers pressured her to settle so that they would not sue her for legal malpractice. Plaintiff received comments saying if Lively sued for malpractice, her lawyers would be able to reveal privileged emails.

93. Plaintiff then did a white board presentation on the Big Law "document view" process of marking documents "response, non-responsive, and hot" and after explaining that the "Dear Ben" and Matt/Lucy Damon communications would have been marked as "hot," Plaintiff imagined the reaction of associate finding the PGA letter for the first time. "And then they found the PGA letter, and even these junior associates were like, holy shit, pencils down. We have to send this up the chain. But in the meantime, party! Because we found it. We found the thing. This is the key document." The video, which has 333.5.k views and a total play time of 7799h:21 minutes, is one example of Plaintiff's popular videos and ends with Plaintiff imagining the partners working on Lively's case emailing each other and saying: "she's out of her mind. What

are we going to do? . . . We have no choice but we have to keep going!"

94. Plaintiff had spent months describing Lively and Reynolds' tortious interference with Baldoni and Wayfarer contracts. She had discussed Lively and Reynolds' bullying of Baldoni and others on set. She had discussed Lively's fraud in the inducement. She had discussed the fraud on Wayfarer and Sony that occurred Lively passed off Reynolds' intellectual property as her own. She had chastised Lively and Reynolds for allowing their then 7-year-old daughter to scream sexual profanities to try to earn her father's love. Now, Plaintiff was confidently declaring that a $100,000,000 million settlement had been paid while Lively still tried to spin a public narrative that she was a victim who had fought the good fight.

95. At this point, Lively and Reynolds instructed Sloane and Shapiro to shadowban Plaintiff and insisted she be prevented from earning any income from her videos discussing Blake Lively, Ryan Reynolds or Justin Baldoni. Sloane and Shapiro then restricted all of Plaintiff's Lively and Baldoni content. In September 2026, Sloane departed Lively's employ and was replaced by Kelly Bush Novak, who was paid via ID Public Relations by Maximum Effort, to continue attacking Plaintiff's account.

96. In October 2026, after Plaintiff attempted posting videos responding to another news article referring to Lively as Baldoni's "victim."

97. Plaintiff noticed that all of her new videos calling Blake Lively a "fraud" were marked as violating community guidelines. Although Plaintiff kept appealing the designation, and the appeal would be granted, Plaintiff's video was still shaded as "ineligible for recommendation" because as soon as the appeal was granted, Shapiro and Novak deployed a fresh wave of community guideline violations on the same video.

98. The conduct was so blatant that Plaintiff began making TikTok videos demanding

that Lively and Reynolds stop interfering with her account and that they take steps to correct the damage they have done through their shadowbanning. After Plaintiff's videos, she was suddenly inundated with hundreds of messages from followers who claimed they had not seen her for months, they thought she left the app altogether, she stopped coming up for them on their FYP (videos viewed on a person's FYP feed are the only ones eligible for income generation on TikTok via the Content Creator Program).

99. Plaintiff also received hundreds of messages indicating that people had been repeatedly, and involuntarily, removed as her followers. On October 11, 2026, Plaintiff sent Lively's attorneys a pre-litigation settlement demand, outlining her belief that Lively and Reynolds had been interfering with her account and had cost her a tremendous amount of income by actions that eliminated her ability to earn money through the Content Creator Program. Ultimately, Plaintiff gave Lively and Reynolds until Friday, October 23, 2026, at 5 p.m. Eastern, to accept her settlement offer or she indicated that she would move forward with litigation.

100. In the interim, since Lively and Reynolds already engaged in a self-destructive litigation for nearly two years and still viewed themselves as the victims, Plaintiff did not have a realistic expectation that they would choose to settle.

101. Plaintiff made videos explaining her intention to sue and that any complaint would need to include a full procedural posture of the case from her contract litigation point of view, so that she could explain the content that had been suppressed. Plaintiff's video stated the obvious - by suppressing her content, Lively and Reynolds had ultimately called more attention to it.

102. Plaintiff explained the litigation process for other content creators, reminded them of the differences between the pleading stage, the discovery stage, dispositive motions and trial,

and that (especially when one party knows they're in the wrong, as Lively and Reynolds do) parties have to undergo a cost/benefit analysis between the benefits of litigating and settlement.

103. Plaintiff made videos explaining that since she was retired from practice and self-employed, she would devote herself fulltime to writing the lawsuit but stated she would start a Go Fund Me to raise money for the filing fee and other court costs. For example, Plaintiff made videos explaining she would have 90 days to serve all parties and, if her lawyers refused to accept service on her behalf, Plaintiff would raise money to pay for skip trace/location services and process servers.

104. Plaintiff made videos addressed to Lively and Reynolds directly and said that they should not have targeted her because she knew how to defend herself and how to fight back against people so callous as to get married on a slave planation, where people similar to her own ancestors were tortured and killed. Plaintiff made videos pointing out that the public felt there was a lack of accountability after Lively's behavior and the settlement with Baldoni and people want to see justice for all the content creators Lively has targeted and harassed since 2025.

105. Plaintiff said a settlement would be a win, but proceeding with litigation would also be a win if it meant exposing the way Lively and Reynolds had bullied and harassed hundreds of people.

106. On October 23, 2026, two hours *after* the Plaintiff's pre-litigation settlement offer had already expired, Plaintiff received a communication from Lively's attorneys that she believed violated the California Rules of Professional Conduct.

107. Plaintiff filed an Attorney Misconduct Complaint against two of Lively's attorneys and sent copies to the Chairs and Executive Committees of Willkie Farr & Gallagher LLP and Manatt Phelps & Phillips LLP. Plaintiff reserved all rights against the lawyers individually and their respective law firms.

108. Fully anticipating that Lively and Reynolds, through their attorneys, would immediately start disparaging Plaintiff by claiming she filed a frivolous lawsuit, Plaintiff made a video which said, in part, "I just want to say something about professional reputations. I clerked for the first Hispanic justice on the Supreme Court of New Jersey, who is also a Cornell Law School alum. My Justice is gonna hear about this lawsuit. Two of his former clerks are federal judges on the bench in New Jersey, whom I know very well, they're gonna hear about this. I'm on a first name basis with five former U.S. Attorneys who are currently partners and their own Chairs of Crisis Management in Big Law. They're going to hear about this. I've been very active in the Hispanic National Bar and the Hispanic Bar of Pennsylvania . . . I have classmates who are partners at firms like Sidley Austin and Cravath, Swaine [and] Moore. They are going to hear about this, and when they read the complaint that I put together, I don't want those people to look at it and be, like, 'Theresa's lost her mind.' I want those people to look at this and be, like, 'that's our girl. Good for her for not only standing up for herself, but for standing up for the likely hundreds of people that Blake Lively and Ryan Reynolds have gone out of their way to harass in order to craft a pro Blake Lively narrative in the media."

## <u>COUNT ONE – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIPS (All Defendants)</u>

109. Plaintiff repeats and realleges paragraphs 1 – 107 as if fully set forth herein.

110. Beginning in March 2025, Lively and Reynolds began a civil conspiracy and

directed Shapiro to work with Sloane in economically harming content creators who spoke negatively about Lively and Reynolds and/or positively about Justin Baldoni.

111. Beginning in May 2026, all Defendants included Plaintiff in their plan and all Defendants specifically acted with malice towards Plaintiff to take "revenge" and "retaliate" against her for explaining that Lively was not a sexual harassment victim but someone who committed fraud, fraud in the inducement, and tortious interference with contractual relationships.

112. All defendants specifically and intentionally acted to cause damage and disruption to Plaintiff's TikTok account. Reynolds and Lively instructed Nick Shapiro (compensated through 10th Avenue Consulting), Leslie Sloane (compensated through Vision PR until August 2026), and Kelly Bush Novak, (starting in September 2026, compensated through ID Public Relations) (collectively the "PR Defendants") to interfere with Plaintiff's economic opportunities. At all relevant times, Plaintiff posted Lively and Baldoni videos on her TikTok account, @theresa.concepcion as well as her YouTube page, @theresa.concepcion.

113. However, all Defendants primarily focused on targeting Plaintiff's TikTok account, but she had tens of thousands more followers on that platform, which meant that her videos had greater income earning potential on TikTok than on YouTube.

114. TikTok was also the primary funnel of listeners to her *Selling Sanity* podcast, as well as the platform that led to users reaching out to retain Plaintiff in consulting roles (which Plaintiff had made videos discussing, thereby alerting all Defendants that she was generating income and adding to their malicious intent to financially harm Plaintiff).

115. First, Sloane and Shapiro, after being via their respective companies paid by Maximum Effort, began slamming all of Plaintiff's videos on TikTok with artificial user reports

in order to flag all her Lively related content. Before their interference, videos from January 2026 had continued to circulate and receive "likes" and "views" over the course of several months because the platform algorithm distributes videos based on topic rather than date of publication. Once Sloan and Shapiro targeted Plaintiff, all her popular views were no longer distributed via platform algorithm and did appear on users' FYP (For You Page). Views from users' FYP page is one of the main metrics for generating income on TikTok.

116. Sloan and Shapiro, on direction from Lively and Reynolds and paid by Maximum Effort, also began "astroturfing" Plaintiff and paid bot networks and/or fake accounts to manipulate Plaintiff's metrics. Many of her previously circulated videos were subsequently flagged with hundreds of community guideline flags. As a direct and proximate result of the PR Defendants' conduct, the platform's automated system "shadowbanned" Plaintiff, and she approximates between 85-95% of her videos posted after May 2026 were prevented from tens and hundreds of thousands of views and intentionally limited to reach hundreds. Defendants' conduct was outrageous, malicious, and involved a reckless disregard for Plaintiff's prospective economic opportunities.[31]

117. In or about May 2026, Plaintiff began including references to hair products she uses from Garnier USA and lipstick from NARS. Other than lipstick, Plaintiff does not wear makeup, and viewers had frequently asked for the color to her lipstick shades as well as the names of the products she uses on her mixed texture curly hair.

118. Plaintiff and viewers began tagging Garnier USA and NARS and, upon information and belief, those brands' automated system ran a check on Plaintiff's account to

[31] Plaintiff has also made videos detailing her financial struggles since retirement, which is why she found it necessary to create a Go Fund Me for the $405 filing fee for this lawsuit. All Defendants are aware of her financial situation and targeted her maliciously anyway.

determine suitability for brand opportunities. Due to all Defendants' conduct maliciously targeting Plaintiff, the brands identified Plaintiff as "high-risk" due to the number of artificial community violations that appeared on her account. But for Defendants' assault on Plaintiff's TikTok account, brands including Garnier USA and NARS would have seen that Plaintiff's account was "healthy," and "low risk," such that she would have been eligible for branding opportunities. The ineligibility that resulted because of Defendants' conduct cost Plaintiff thousands of dollars per potential brand video.

119. Defendants' assault on Plaintiff's TikTok account also excluded her from the TikTok Creator Rewards Program. As a result of Defendants' efforts, Plaintiff estimates that at least 1,000 of her videos from January 2026 to present were marked as violating community guidelines or were otherwise targeted and prevented from being distributed and earning at least $1,000, each, through the Creator Rewards Program. Also, as a result of Defendants' efforts, Plaintiff's follower count stalled and she estimates at least 1,000 videos were each capable of generating an average of 16,000 new followers. Thus, Defendants cost Plaintiff 1.6M new followers and income opportunities associated with a following of that size.

120. But for Defendants' assault on Plaintiff's TikTok account, hundreds of thousands of viewers would have seen Plaintiff's videos breaking down contract law and advice for small business owners that drew parallels to the Lively / Baldoni contract issues. Defendants' assault on Plaintiff's TikTok account also eliminated the steady stream of consulting opportunities she had started to receive from small business owners.

121. But for Defendants' assault on Plaintiff's TikTok account, Plaintiff's account would have garnered millions of followers, millions of views on thousands of videos, and generated hundreds of thousands of dollars in consulting revenue.

122. As a result, Defendants cost Plaintiff potential clients seeking to hire Plaintiff for contract consulting services.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

1. For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, in an amount to be proven at trial;

2. For pre- and post-judgment interest;

3. For punitive damages according to proof;

4. For such other legal and equitable relief as the Court deems appropriate.

DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action triable by jury.

Dated: November 13, 2026

Respectfully submitted,

Theresa Concepcion

*Theresa L. Concepcion, pro se*

Theresa Concepcion
7929 Eastern Avenue, #1049
Baltimore, MD 21224